**ADANTÉ D. POINTER, ESQ., SBN 236229**
**PATRICK M. BUELNA, ESQ., SBN 317043**
**TY CLARKE, ESQ., SBN 339198**
POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert St., Suite 208
Oakland, CA 94607
Tel: 510-929-5400
Website: www.LawyersFTP.com
Email: APointer@LawyersFTP.com
Email: PBuelna@LawyersFTP.com
Email: TClarke@LawyersFTP.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF MAURICE MONK, brought by successors-in-interest, NIA'AMORE MONK & KYSE MONK; NIA'AMORE MONK, an individual; KYSE MONK, an individual;

        Plaintiffs,

v.

ALAMEDA COUNTY, a municipal corporation; WELLPATH COMMUNITY CARE, LLC, a corporation; DONNALL ROWE, in his/her individual capacity TIMOTHY MEFFORD, in his/her individual capacity; ROBINDERPAL HAYER in his/her individual capacity; TROY WHITE, in his/her individual capacity; HOMOYAN SAFFARIAN, in his/her individual capacity; ANDRE GASTON, in his/her individual capacity; CHRISTOPHER HAENDEL in his/her individual capacity; ROSS BURRUEL, in his/her individual capacity; MATEUSZ LASZUK, in his/her individual capacity; STEVE HAMILTON, in his/her individual capacity; SYEAR OSMANI, in his/her individual capacity; JULIO MORALES CHAVEZ, in his/her individual capacity;  N. LAPONI, in his/her individual capacity; CRAIG TANAKA, in his/her

Case No.: 3:22-cv-04037-TSH

SECOND AMENDED COMPLAINT FOR DAMAGES
(42 U.S.C. § 1983)

JURY TRIAL DEMANDED

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

1

individual capacity; RICHARD )
QUINTEROS, in his/her individual capacity; )
JONNAH CALABAIO, in his/her individual )
capacity; HARMEET DHATT, in his/her )
individual capacity; DAVID DONOHO, in )
his/her individual capacity; CHISA EARL, in )
his/her individual capacity; RANJEET )
KAUR, in his/her individual capacity; )
JOSEPH LOPEZ, in his/her individual )
capacity; KATHLEEN MARTINEZ, in )
his/her individual capacity; THERESA MAI, )
in his/her individual capacity; HYUN CHOI, )
in his/her individual capacity and DOES 1- )
50, inclusive. )

Defendants. )

_____ )

# INTRODUCTION

1.      This case arises out of the slow, torturous death of Mr. Maurice Monk at the hands of several Alameda County Sheriff's Deputies and WellPath Community Care's medical staff while the loving father of two children was being held at Alameda County's infamous Santa Rita Jail. October 11, 2021, Mr. Monk was taken into Santa Rita Jail's custody because he missed a court appearance for a minor, nonviolent misdemeanor and could not afford to make bail.

2.      Over the course of the next 34 days, Santa Rita Jail medical & law enforcement staff were so utterly callous and indifferent to Mr. Monk's mental and physical health that he rapidly deteriorated in their care while his family called the jail incessantly pleading that the jail provide Mr. Monk his medications and basic medical care. Not only did the jail staff not provide Mr. Monk many of his medications but when Mr. Monk's deteriorating health devolved into a medical emergency the jail and medical staff simply watched him slowly suffer and die in a pool of his own urine & feces while they literally tossed his medication onto the cell floor.

3.      In the final week of his life, Mr. Monk went from talking & interacting with jail staff to catatonic: not eating, not taking medication, not drinking water, not responding to jail staff, or moving at all. For the final three days of his life, jail & medical staff observed Mr. Monk lying face

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

2

down on his bunk, his lower body naked, covered in his feces, a puddle of urine pooled around his bed and days of unopened meals, water & medication gathered at the door of his cell.



4.      Mr. Monk's medical emergency was so dire and the jail & medical staff's response to it so callous that one inmate who helped distribute meals in the jail asked the deputies: "Are we just waiting for him to kick the bucket?"

5.      Despite that Mr. Monk had been classified in Housing Unit #1 – a high-priority inmate section of the jail that specifically attends to inmates with mental health issues – Santa Rita jail & medical staff provided none of the required medical care and treatment. Jail staff were required to conduct wellness checks *every 30 minutes* in Mr. Monk's housing unit because this classification of inmates are at high risk of health crises and the increased wellness checks are designed to ensure that the inmates are safe and well-cared for. But body worn cameras and internal affairs investigations revealed that the involved jail and medical staff were *forging* the wellness

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

check timelines and medication compliance logs. Indeed, one deputy even told investigators that it was normal for deputies to miss several wellness checks and simply fill them in later to suggest deputies had conducted the checks.

6.      WellPath medical staff and County deputies observed, quipped and joked about Mr. Monk's spiraling health over the final days of his life. When Maurice Monk laid for three days in his own feces and urine without eating or drinking, the jail & medical staff never called a doctor for medical evaluation, took his vitals, or even roused him to talk to ensure he was okay. He was in the same position for so long he actually developed bed sores on his legs and the ink of his red t-shirt stained his mattress.

7.      For 3 days, jail and medical staff claimed to see his toe move or his chest rise, and so that was enough. Until finally, a group of deputies and medical staff entered his cell after 3 days of not moving, eating or drinking, and discovered that Maurice Monk was stiff and not breathing.



PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

4

8.      The case of Maurice Monk's death is equal parts tragic, shocking, and preventable. Dozens of the Defendants' employees, including jail medical staff and deputy *and sergeant* sheriffs, saw Mr. Monk in obvious medical distress in the weeks leading up to his lifeless body being found in the jail cell that he had not left for ten days.

9.       None of these employees, who are now defendants in this case, took the legally required steps to provide Mr. Monk the medical care he so desperately needed. The only person who seemed to care about Mr. Monk's life at all was an inmate working in the jail, who regularly warned multiple deputies that Mr. Monk was not eating, drinking or even moving for the days leading up to his death.

10.      Under both California law and the Constitution of the United States, the County Jail staff and WellPath medical staff owed Mr. Monk the duty to provide adequate medical care. Every Defendant named in Plaintiffs' complaint violated this duty. This is not simply Plaintiffs' assertion—the Defendant County's internal affairs investigation into Mr. Monk's death found numerous policy violations among several of the Defendants, including falsified observation logs and failures to identify numerous signs that Mr. Monk was in medical distress.

11.      It is not lost on Plaintiffs that Defendant County's Coroner's Office claimed in its autopsy that Mr. Monk died of natural causes. Plaintiffs have no doubt that Mr. Monk's death would have been another one of the nearly 70 deaths at Santa Rita Jail since 2014 that would have been swept under the rug if not for the tireless efforts of Mr. Monk's family, hundreds of attorney hours reviewing body-worn camera footage and jail records, and a national wave of media coverage.

12.      Mr. Monk's death is an unconscionable failure of the entire Santa Rita Jail staff, from law enforcement supervisors to medical staff to deputy and sergeant sheriffs. It is an abhorrent

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

disregard of basic morality and Constitutional requirements that should shake this deeply flawed government entity to its core.

<u>**JURISDICTION**</u>

13.     This action arises under Title 42 of the United States Code, Section 1983. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections 1331 and 1343. The unlawful acts and practices alleged herein occurred in Dublin, California in Alameda County, which is within this judicial district.

<u>**PARTIES**</u>

14.     Decedent MAURICE MONK (hereinafter "Decedent") was an adult, and died intestate, unmarried, and was the biological father of Plaintiffs NIA'AMORE MONK and KYSE MONK.

15.     Plaintiff ESTATE OF MAURICE MONK (hereinafter "Plaintiff ESTATE") brings this case through its successors-in-interest NIA'AMORE MONK and KYSE MONK. Plaintiff ESTATE brings these claims on behalf of Decedent pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions. The wrongful death and survival claims survive the death of Decedent; both arise from the same wrongful act or neglect of another; and such claims are properly joined pursuant to California Code of Civil Procedure 377.62. Plaintiff ESTATE also brings its claims on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and federal civil rights law. Plaintiff also brings these claims as Private Attorney General, to vindicate not only Decedent's rights, but also others' civil rights of great importance.

16.     Plaintiff NIA'AMORE MONK (hereinafter "NIA MONK") is a competent adult, a resident of California, and a citizen of the United States. Plaintiff NIA MONK is the biological daughter of Decedent. Plaintiff NIA MONK brings these claims individually on the basis of 42

U.S.C. §§ 1983 and 1988, the United States Constitution, and federal civil rights law. Plaintiff also brings these claims as Private Attorney General, to vindicate not only her rights, but also others' civil rights of great importance. Plaintiff NIA MONK also brings survival claims via the ESTATE on behalf of Decedent and wrongful death claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq.,

17.    Plaintiff KYSE MONK is a minor and brings his claims through his *guardian ad litem* KANDI STEWART. KANDI STEWART is a resident of California, and a citizen of the United States and the biological mother of KYSE MONK. Plaintiff KYSE MONK is the biological son of Decedent. Plaintiff KYSE MONK brings these claims individually on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and federal civil rights law. Plaintiff also brings these claims as Private Attorney General, to vindicate not only her rights, but also others' civil rights of great importance. Plaintiff also brings survival claims via the ESTATE on behalf of Decedent and wrongful death claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq.,

18.    Defendant ALAMEDA COUNTY (hereinafter "Defendant COUNTY") is and at all times herein mentioned is a municipal entity duly organized and existing under the laws of the State of California that manages and operates the ALAMEDA COUNTY SHERIFF'S OFFICE and SANTA RITA JAIL. Defendant COUNTY is vicariously liable, pursuant to California Government Code §815.2, for the violation of rights by its employees and agents.

19.    Defendant WELLPATH COMMUNITY CARE, LLC (hereinafter "Defendant WELLPATH") was at all times herein mentioned a Delaware corporation licensed to do business in California. Defendant WELLPATH also has several aliases including but not limited to the California Forensic Medical Group & Corizon Health. Defendant WELLPATH provided medical, psychiatric, nursing, medication and healthcare to prisoners and detainees in Alameda County jails,

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

pursuant to contract with the COUNTY OF ALAMEDA. On information and belief, WELLPATH

and its employees and agents are responsible for making and enforcing policies, procedures, and

training related to the medical care of prisoners and detainees in Defendant COUNTY OF

ALAMEDA's jails. Defendant WELLPATH is vicariously liable, pursuant to California

Government Code §815.2, for the violation of rights by its employees and agents

20. Defendant DONNALL ROWE (hereinafter "Defendant Rowe") was, and at all times

herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

21. Defendant TIMOTHY MEFFORD, (hereinafter "Defendant Mefford") was, and at

all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

22. Defendant ROBINDERPAL HAYER (hereinafter "Defendant Hayer") was, and at

all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

23. Defendant TROY WHITE (hereinafter "Defendant White") was, and at all times

herein is, a law enforcement employee of the Alameda County Sheriff's Office.

24. Defendant HOMAYOON SAFFARIAN (hereinafter "Defendant Saffarian") was,

and at all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

25. Defendant ANDRE GASTON (hereinafter "Defendant Gaston") was, and at all times

herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

26. Defendant CHRISTOPHER HAENDEL (hereinafter "Defendant Haendel") was, and

at all times herein is, a Sergeant of the Alameda County Sheriff's Office.

27. Defendant ROSS BURRUEL (hereinafter "Defendant Burruel") was, and at all times

herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

28. Defendant MATEUSZ LASZUK (hereinafter "Defendant Laszuk") was, and at all

times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

8

29.    Defendant SYEAR OSMANI (hereinafter "Defendant Osmani") was, and at all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

30.    Defendant STEVEN HAMILTON (hereinafter "Defendant Hamilton") was, and all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

31.    Defendant N. LAPONI (hereinafter "Defendant Laponi") was, and at all times herein is, a law enforcement employee of the Alameda County Sheriff's Office.

32.    Defendant RICHARD QUINTEROS (hereinafter "Defendant Quinteros") was, and at all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

33.    Defendant CRAIG TANAKA (hereinafter "Defendant Tanaka") was, and at all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

34.    Defendant J. MORALES (hereinafter "Defendant Morales") was, and all times herein is, a Deputy Sheriff of the Alameda County Sheriff's Office.

35.    Defendant RANJEET KAUR (hereinafter "Defendant Kaur") was, and at all times herein is, a nurse working for Defendant WELLPATH.

36.    Defendant CHISA EARL ((hereinafter "Defendant Earl") was, and at all times herein is, a nurse working for Defendant WELLPATH.

37.    Defendant JOSEPH LOPEZ (hereinafter "Defendant Lopez") was, and at all times herein is, a nurse working for Defendant WELLPATH

38.    Defendant THERESA MAI (hereinafter "Defendant Mai") was, and at all times herein is, a physician's assistant working for Defendant WELLPATH.

39.    Defendant DAVID DONOHO (hereinafter "Defendant Mai") was, and at all times herein is, a nurse working for Defendant WELLPATH.

40.    Defendant JONNAH MAICAH CALABIAO (hereinafter "Defendant Calabiao") was, and at all times herein is, a nurse working for Defendant WELLPATH.

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

9

41.   Defendant HYUN CHOI (hereinafter "Defendant Choi") was, and at all times herein is, a nurse working for Defendant WELLPATH.

42.   Defendant JACQUELINE JALLORINA (hereinafter "Defendant Jallorina") was, and at all times herein is, a nurse working for Defendant WELLPATH.

43.   Defendant HAMEET DHATT (hereinafter "Defendant Dhatt") was, and at all times herein is, a nurse working for Defendant WELLPATH.

44.   Defendant KATHLEEN MARTINEZ (hereinafter "Defendant Martinez") was, and all times herein is, a nurse working for Defendant WELLPATH.

45.   Plaintiffs are ignorant of the true name and/or capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sues said defendants by such fictitious names. DOES 1-50 are hereinafter referred to as "Defendant Jail Staff". Plaintiffs will amend this complaint to allege the true names and capacities of Defendant Jail Staff when ascertained. Plaintiffs believe and allege that each of the Defendants Jail Staff are legally responsible and liable for the incident, injuries and damages hereinafter set forth. Each defendant proximately caused injuries and damages because of their negligence, breach of duty, negligent supervision, management or control, violation of public policy, and use of excessive force. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiffs will ask leave to amend this complaint.

46.   In doing the acts alleged herein, Defendant Jail Staff acted within the course and scope of their employment for Defendant COUNTY and/or WELLPATH.

47.   In doing the acts and/or omissions alleged herein, Defendants acted under color of authority and/or under color of law.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

10

48.     Due to the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, and employee and/or in concert with each of said other Defendants herein.

49.     Plaintiffs filed a timely government claim with Defendant COUNTY on February 9, 2022, which was rejected by operation of law.

## FACTUAL ALLEGATIONS

50.     On or about October 11, 2021, Maurice Monk was detained by Defendant Alameda County at Santa Rita Jail because there was a bench warrant for his arrest for failing to appear in court to answer for a non-violent misdemeanor case.

51.     A judge set bail at $2,500. Mr. Monk and his family were unable to afford the bail and as a consequence he was forced to stay in Santa Rita Jail for over a month.

**THE JAIL FAILED TO PROVIDE ADEQUATE MEDICAL CARE TO MR. MONK THROUGHOUT HIS 34 DAY DETENTION**

52.     Prior to this period of incarceration, Mr. Monk was regularly taking a number of prescribed medications for high blood pressure, diabetes, and schizophrenia that kept him stable and healthy.

53.     During the previous detention at Santa Rita Jail between June and August of 2021, Mr. Monk had been properly prescribed and given HCTZ, Metformin, haloperidol, and benztropine.

54.     During Mr. Monk's subsequent detention at Santa Rita Jail in that began on October 12, 2021 and ended November 15, 2021 with his death, Defendant WellPath medical staff failed to prescribe haloperidol and benztropine, which are medications that treat Mr. Monk' schizophrenia. Santa Rita Jail Staff Deputies Rowe, Mefford, Hayer, White, Saffarian, Gaston, Haendel, Burruel, Laszuk, Hamilton, Osmani, Laponi, Quinteros, Tanaka, Morales and Santa Rita Medical Staff Kaur, Earl, Lopez, Mai, Donoho, Calabiao, Choi, Jallorina, Dhat, Martinez all had access and were aware of Mr. Monk's medical conditions as he had been administered the same and/or similar medications

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

during a previous stay at Santa Rita Jail. All these Defendants had access to this medical and jail history.

55.     During Mr. Monk's October 12-November 15, 2021 detention, his sister, Elvira Monk, repeatedly contacted Defendant Jail Staff to inform them of Mr. Monk's medical needs. She provided medical records to show his prescribed medications and even brought the prescription medications to the jail. Ms. Elvira Monk was scared that without his medications, Mr. Monk's psychiatric and physical health would rapidly decline and endanger his life.

56.     However, Defendant Jail Staff rejected Elvira Monk's numerous attempts to get her brother the medications he needed. Instead, Defendant County & WellPath directed her through a series of frustrating bureaucratic processes that led to no results. Nevertheless, she incessantly contacted Defendant Jail Staff and sadly sent them medical documentation up until November 16, 2021—the day after Mr. Monk died—because they failed to advise her of her brother's passing.

57.     During Mr. Monk's booking at Santa Rita Jail on October 12, 2021, Alameda County Deputy Sheriff Ashley Krause wrote in Mr. Monk's housing classification report that Mr. Monk would need to be evaluated by the Defendant County's Adult Forensic Behavioral Health (AFBH) unit.

58.     More than three weeks later, on November 4, 2021, Defendant Wellpath's nurse R. Shipp again requested that Mr. Monk be evaluated by AFBH. There are no records to indicate Mr. Monk was ever evaluated by the AFBH between October 12, 2021 and when his body was discovered on November 15, 2021As part of the prescribed treatment for his schizophrenia, Mr. Monk took regularly scheduled injections of the medication haloperidol—brand name Halidol. He was scheduled for his next injection on or about November 9, 2021. Elvira Monk informed Santa Rita Jail staff of this fact, yet Defendants did not make any attempt to provide Mr. Monk his medically-necessary Halidol injection.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

59.     Nurse Shipp also noted that Mr. Monk had a history of taking mental health medication at Santa Rita Jail but was not receiving medication for it currently. Nurse Shipp was likely referring to the aforementioned haloperidol and benztropine prescription from Mr. Monk's previous detention.

60.     On or about November 11, 2021, Defendant Theresa Mai, a physician's assistant for Defendant Wellpath, approved renewing Mr. Monk's prescription for HCTZ and metformin. There are no records to indicate Defendant Mai ever medically evaluated Mr. Monk despite her renewing the aforementioned medications.

61.     Defendants County and Wellpath, by and through the acts of the identified individual Defendants, failed to provide Mr. Monk any meaningful medical treatment for his schizophrenia despite Elvira Monk's numerous efforts..

62.     Not only did the individual Defendants failed to provide Mr. Monk his psychiatric treatment, but they also utterly failed their duty to provide his basic physical care.

63.     On October 19, 2021, Defendant Mai scheduled weekly blood pressure checks on Mr. Monk moving forward. Defendant Mai set this at priority level 1, which is the highest priority possible. However, Mr. Monk's blood pressure appeared to be last checked on October 27, 2021 and was not checked again before his body was discovered on November 15, 2021.

64.     Mr. Monk was scheduled for another blood pressure check on October 4, 2021. Defendant Wellpath's nurse, R. Shipp, recorded that they were unable to take Mr. Monk's blood pressure, noting that he was "aggressive and agitated". This was the same date on which Nurse Shipp also requested that Mr. Monk be evaluated by AFBH and noted that Mr. Monk had previously been prescribed mental health medication.

65.     Neither Defendant Mai nor any other of the named Defendant Wellpath nurses followed up on the failure to obtain Mr. Monk's blood pressure or Nurse Shipp's request that Mr.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

13

Monk be evaluated by AFBH and note that Mr. Monk had previously been prescribed additional medications.

66.     Defendant Wellpath's nurses did not attempt to take Mr. Monk's blood pressure again until the next scheduled appointment the following week, on the morning of November 10, 2021. On that date, Defendant Wellpath Nurse Evelyn Hirsch rescheduled the appointment from the morning to the evening, noting "OTC"—a commonly-used acronym for "out to court". It is unclear why Ms. Hirsch did this, as Mr. Monk was not in court on that date.

67.     Defendant Wellpath's nurse K. Cantillas then attempted to check Mr. Monk's blood pressure on the afternoon or evening of November 10, 2021. Nurse Cantillas wrote that they were unable to obtain Mr. Monk's blood pressure due to "safety reasons" and recorded this as a refusal. Nurse Cantillas provided no additional information describing what the alleged "safety reasons" were.

68.     On information and belief, Defendants Kaur, Earl, Lopez, Mai, Donoho, Calabiao, Choi, Jallorina, Dhat, Martinez all had information via Mr. Monk's medical file and interactions with him afterwards that necessitated the checking of his blood pressures, the providing of his psychiatric medicines but repeatedly failed to obtain and provide this basic medical care.

69.     As a result, Mr. Monk's psychiatric and physical health quickly spiraled into a medical emergency.  Each and every one of the named Defendant individuals interacted and had reason to intervene and treat Mr. Monk's serious medical needs but failed.

**MR. MONK'S FINAL DAYS**

70.     Plaintiffs note that while Mr. Monk's body was determined dead after a wellness check in the evening hours of November 15, 2021, it is likely that Mr. Monk was dead well before this. Tim Schellenberg, the Santa Rita Jail Operations Captain for the Defendant County's Sheriff's

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

Office, wrote in an email to lieutenants that Mr. Monk was found dead in his cell and that he "may have been dead for quite some time."

71.     Identifying the exact date or time of Mr. Monk's death is complicated by the fact that the named Defendant deputies and Wellpath nurses never took the time to actually confirm Mr. Monk was alive beyond claiming a toe moved or his chest rose and fell despite him remaining in the same unnatural position for several days in his own urine and feces without drinking, eating or taking medications.

72.     Based upon the records produced to date it appears Mr. Monk's last court appearance was on either November 3 or 4 of 2021. On November 5, 2021, Mr. Monk left his cell for "pod time"—a period of recreation where detainees are permitted to be outside their cells. According to the investigative report on Mr. Monk's death prepared by Alameda County Sheriff's Deputy Ryan Sprague, this was the last time that Mr. Monk was seen outside of his cell—10 days before his lifeless body was discovered.

73.     It appears Mr. Monk's troubling medical downturn accelerated after his last court visit in early November. Defendants Rowe, Mefford, Hayer, White, Saffarian, Gaston, Haendel, Burruel, Laszuk, Hamilton, Osmani, Laponi, Quinteros, Tanaka, Morales and Santa Rita Medical Staff Kaur, Earl, Lopez, Mai, Donoho, Calabiao, Choi, Jallorina, Dhat, Martinez observed and attempted to speak with Mr. Monk during that time, yet none of them took any meaningful action to provide Mr. Monk the medical care that he so obviously needed.

74.     On the evening of November 7, 2021, Mr. Monk came to his cell door to receive medication for high blood pressure and diabetes. On information and belief, this was the last time that Mr. Monk physically received any medication. In his report, Deputy Sprague wrote that upon a review of body-worn camera footage from the Defendant County's deputies from November 11,

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

15

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

2021 through November 15, 2021, Deputy Sprague never saw Mr. Monk physically receive any of his medication.

75. On the evening of November 8, 2021, Defendant N. Laponi, an employee of the Defendant County, and Defendant Jonnah Maicah Calabiao, a nurse for Defendant Wellpath, were providing medications to the detainees in Mr. Monk's housing unit. When they arrived at Mr. Monk's cell door, Defendant Laponi knocked on the door to ask Mr. Monk if he wanted his medication. Defendant Laponi yelled Mr. Monk's name before saying "fuck it" and walking away from Mr. Monk's cell. When Defendant Calabiao and/or another Defendant Wellpath employee asked Defendant Laponi if Mr. Monk was okay, Defendant Laponi responded that Mr. Monk was sitting on his bed talking to himself. Defendant Calabiao recorded this as Mr. Monk refusing his medication.

76. On information and belief, Defendant Calabiao took no further steps to inquire into Mr. Monk's well-being on the night of November 8, 2021 or any subsequent days.

77. On the morning of November 9, 2021, Defendant Luis Mendez, a deputy sheriff for the Defendant County, and Defendant David Donoho, a registered nurse working for Defendant Wellpath, were providing medications to the detainees in the unit in which Mr. Monk was housed along with another Defendant County deputy sheriff. The deputy looked into Mr. Monk's cell before asking Defendant Mendez to take a look at Mr. Monk. Defendant Mendez stared at Mr. Monk through the cell door's window for approximately 10 seconds before asking him if he wanted his medication. Based on a body-worn camera recording from this encounter, Mr. Monk did not appear to respond to Defendant Mendez.

78. The deputies then had Defendant Donoho place the medication into a small paper cup while Defendant Mendez resumed looking into Mr. Monk's cell. The deputy then opened the cell door and dropped Mr. Monk's medication on the floor. Defendant Mendez informed Mr. Monk

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

16

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

that they had placed his medication on the floor before leaving. Defendant Donoho recorded this as Mr. Monk receiving his medication.

79.     On information and belief, Defendant Mendez had reason to believe that Mr. Monk was in medical distress and stared at him for an extended period of time, yet never took any further steps to ensure that Mr. Monk was receiving proper care, interacted with him or requested any medical evaluation.

80.     On the evening of November 9, 2021, Defendant Steven Hamilton, a deputy sheriff for Defendant County, and Defendant Calabiao approached Mr. Monk's cell to provide him medication. Defendant Hamilton noted that Mr. Monk was partially or fully naked and told him to put clothes on. When Defendant Hamilton returned, he quickly looked inside the cell before telling Defendant Calabiao that Mr. Monk was refusing. Defendant Calabiao then recorded that Mr. Monk verbally refused his medication, but no audio of Mr. Monk refusing was captured on Defendant Hamilton's body-worn camera.

81.     Defendant Hamilton told Defendant Calabiao to mark Mr. Monk as refusing medication because Mr. Monk was still partially or fully naked. Defendants Hamilton and Calabiao failed to alert any supervisors or additional medical personnel to Mr. Monk's behavior. Neither jail nor medical staff can refuse to provide medical care to someone simply because that person is partially naked or in the midst of a medical emergency..

82.     On the morning of November 10, 2021, Defendant Hyun Choi, a nurse for Defendant Wellpath, recorded that Mr. Monk had refused his medication that morning. Defendant Choi further indicated that a refusal form for this supposed refusal was signed by a deputy and nurse. However, this alleged refusal was not captured on body-worn camera nor has the documentation of this refusal been disclosed to Plaintiffs during the course of litigation. Given the consistent misrepresentations

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

17

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

made by several Wellpath nurses concerning the administration of Mr. Monk's medicine, it is unlikely that Mr. Monk actually refused his medication.

83.     On the evening of November 10, 2021, Defendant Jacqueline Jallorina, a nurse for Defendant Wellpath, recorded that Mr. Monk received his medication for that night. However, body-worn camera recordings from a deputy from the evening of November 10, 2021, showed that the deputy asks Mr. Monk if he wants his medication and Mr. Monk simply made no response. The deputy then said "refusal". To date, no evidence has been produced to substantiate Defendant Jallorina's claim that Mr. Monk received his medication.

84.     On the morning of November 11, 2021, Defendant Deputies Saffarian, Burruel, and a third deputy sheriff along with Defendant Nurse Hameet Dhatt were providing medication to the detainees in Mr. Monk's housing unit. One deputy told Defendants Saffarian and Dhatt that they could put Mr. Monk's medication in a cup "and then just throw it in." The deputy stated that ***this is what they usually do for Mr. Monk***.

85.     Defendant Saffarian asked this how he knew to do this for Mr. Monk specifically and in response the deputy said "***just look at him***" while gesturing at Mr. Monk. Defendant Saffarian looked into the cell and then said "oh yeah". Defendant Dhatt then handed the paper cup with the medication in it to the deputy, who folded the top of it, handed it to Defendant Saffarian, and told him to "throw it in" when he opened the cuff port on the cell door.

86.     On the afternoon of November 11, 2021, Alameda County Sheriff's Deputy Shawn Atwal and Defendant Deputies Richard Quinteros and Timothy Mowrer were serving dinner to detainees in Mr. Monk's housing unit. They were assisted by an inmate pod worker (hereinafter "Pod Worker 1"). When they arrived at Mr. Monk's cell, they found him sitting up on his bed with his feet on the floor. He was wearing his red Santa Rita Jail t-shirt and was naked from the waist down. He did not speak when the deputies opened his cell door to place his food inside. Deputy

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

Sprague noted in his investigative report that this interaction—more than four days before Mr. Monk was found dead in his cell—was the last time that Mr. Monk was seen "alive and ambulatory on camera".

87.    Later in the evening of November 11, 2021, Defendant Robinderpal Hayer, a deputy sheriff for Defendant County, and Defendant Chisa Earl, a nurse for Defendant Wellpath, were providing medications to the detainees in the unit in which Mr. Monk was housed. When they arrived at Mr. Monk's cell, Defendant Hayer began knocking on the cell window and asking Mr. Monk whether he wanted his medication. When Mr. Monk did not respond, Defendant Hayer turned to walk away before telling Defendant Earl that Mr. Monk was "butt naked and asleep". Defendant Earl requested that Defendant Hayer should try to wake up Mr. Monk. Defendant Hayer went back to Mr. Monk's cell and shined his flashlight into the cell. Mr. Monk was face down on his mattress and naked from the waist down. Defendant Hayer suggested putting Mr. Monk's medication in a cup and dropping it into the cell. Defendant Earl agreed, saying "hopefully he sees it". Defendant Earl then recorded this as Mr. Monk receiving his medication.



POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

19

**NOVEMBER 12, 2021—THREE DAYS BEFORE MR. MONK'S BODY WAS FOUND**

88.     At approximately 5:30 AM on November 12, Defendants Homayoon Saffarian and Donnall Rowe, deputy sheriffs for the Defendant County, were serving breakfast to detainees in Mr. Monk's housing unit with the help of Pod Worker 1. When they arrived at Mr. Monk's cell, Defendant Saffarian claimed that Mr. Monk was standing in his cell. Defendant Saffarian told Mr. Monk to sit down; when Mr. Monk did not immediately comply, Defendant Saffarian said that Mr. Monk was refusing and left the cell without providing Mr. Monk any food. Mr. Monk was not seen or heard on Defendant Saffarian's body-worn camera recording of the incident.

89.     No records have been produced in the course of this litigation indicating Defendants Saffarian and Rowe reported Mr. Monk's strange behavior or perceived non-compliance to supervisors or any medical staff.

90.     At approximately 8:51 AM on November 12, Defendant Richard Quinteros, a deputy sheriff for the Defendant County, and Defendant Donoho, a nurse for Defendant Wellpath, were providing medication to the detainees in Mr. Monk's unit. When they arrived at Mr. Monk's cell, Defendant Quinteros asked Mr. Monk if he wanted his medication. Mr. Monk did not respond and a few seconds later Defendants Quinteros and Donoho left Mr. Monk's cell. Defendant Donoho recorded this as Mr. Monk refusing medication, but in Defendant Quinteros' body-worn camera recording from this interaction, Mr. Monk cannot be seen or heard at any point.

91.     At approximately 11:24 AM on November 12, Defendant Rowe and Pod Worker 1 were serving lunch to detainees in Mr. Monk's housing unit. When they arrived at his cell, Defendant Rowe stated that Mr. Monk was laying down in bed and opened his cell door. Pod Worker 1 placed Mr. Monk's food just inside the doorway to the cell. Mr. Monk was not seen or heard on the video.

92.     At approximately 3:51 PM on November 12, Defendant Rowe and Pod Worker 1 were serving dinner in Mr. Monk's housing unit. When they arrived at Mr. Monk's cell, Defendant

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

Rowe told Pod Worker 1 that Mr. Monk had not moved, presumably since when they saw him for lunch. Defendant Rowe opened Mr. Monk's cell door and called out his name which received no response. Pod Worker 1 placed the dinner intended for Mr. Monk inside his cell and removed four cardboard trays of unopened food and two unopened cartons of milk. Defendant Rowe also told Pod Worker 1 that Monk was not moving but he was breathing. He continued staring into Mr. Monk's cell, seemingly concerned. He remarked that he could not tell if the liquid beneath Mr. Monk was urine or milk.



93.     As Defendant Rowe and Pod Worker 1 continued their dinner rounds, Pod Worker 1 told Defendant Rowe that Mr. Monk had not eaten since November 10, 2021, (two days prior) and that he should consider informing Defendant Andre Gaston, another deputy sheriff for the Defendant County.

94.     Approximately 25 minutes later, Defendants Gaston and Rowe walked to Mr. Monk's cell to perform a wellness check. Defendant Gaston opened the door and called out Mr. Monk's name numerous times, but Mr. Monk did not respond. Mr. Monk was lying face down on

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

his bed, wearing his Santa Rita Jail red t-shirt and naked from the waist down. There was a pool of brown liquid on the cell floor just below Mr. Monk.

95.     After shining a flashlight on Mr. Monk and observing him for approximately 35 seconds, Defendant Gaston asked Defendant Rowe if Mr. Monk was breathing. Defendant Rowe responded "yeah, that's why I'm not like freaking out, I see him breathing." Defendant Gaston then asked if Mr. Monk had been in the face down position the whole time, to which Defendant Rowe responded that Mr. Monk had been in that position the whole day and was not eating.



96.     Defendant Gaston then moved further into the cell, kicking unopened food trays out of the way as he did. He continued calling Mr. Monk's name while shining his flashlight. Mr. Monk's cell was littered with food trays and pill cups.

/
/
/
/

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

97.     Eventually, Mr. Monk slightly raised his head while remaining in the same position. Defendant Gaston then immediately left Mr. Monk's cell and said that he was "just sleeping". Deputy Sprague noted in his investigative report that this was the last that Mr. Monk that was seen moving on any video recordings and that "[m]ultiple different body worn camera videos show Monk in the same position on the lower bunk, not moving, from 11-14-21, around 0615 hours, to 11-15-21, around 1935 hours when he was found."

98.     Once again, no records have been produced which confirm Defendants Gaston and Rowe ever requested medical attention for Mr. Monk after this encounter or that they took any additional steps to follow up on the fact that Mr. Monk had hardly moved that day and had not eaten in several days.

99.     Later in the evening of November 12, Defendant Deputy Hayer and Defendant Nurse Calabiao went to Mr. Monk's cell as part of the evening medication rounds in the housing unit. Defendant Hayer's body-worn camera captured Mr. Monk, who was lying in virtually the identical

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

position that Defendants Gaston and Rowe had left him in a few hours prior. The pool of brown liquid on the cell floor just below Mr. Monk was still there. Defendant Hayer yelled through the cell door to ask Mr. Monk if he wanted his medication. Mr. Monk did not move or otherwise respond. Defendant Hayer told Defendant Calabiao to put Mr. Monk's medication in a cup. Defendant Hayer then tossed the cup with the medication onto the floor of the cell. Defendant Calabiao recorded this as Mr. Monk receiving his medication.

**NOVEMBER 13, 2021—TWO DAYS BEFORE MR. MONK'S BODY WAS FOUND**

100.    At approximately 6:17 AM on November 13, Defendant Deputies Rowe and Saffarian along with Pod Worker 1 were serving breakfast to the detainees in Mr. Monk's housing unit. When they arrived at Mr. Monk's cell, Defendant Rowe asked "is he awake?' In response, Pod Worker 1 asked Defendant Rowe "is he still alive?" Defendant Rowe then remarked "my goodness, he's still there", in reference to the fact that Mr. Monk was still in the same position that they had seen him in yesterday. Defendant Saffarian then opened the cell door and Pod Worker 1 put the meal on the cell floor. After the cell door was closed, Defendant Rowe continued staring into Mr. Monk's cell before eventually moving on with the meal service.

101.    Defendants have not produced any information showing Defendant Rowe ever reported his apparent concern regarding Mr. Monk's health that was evident in this encounter to any jail medical staff or supervisors. Plaintiffs are not aware of any evidence that proves he took any additional steps to ensure that Mr. Monk was not in medical distress. To the contrary all of the observation logs demonstrated that not a single of the named Defendants reported Mr. Monk's unusual behavior.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

102.    In the RedBook[1] (a log for all unusual activity in Housing Unit 1 where Mr. Monk was placed), there was absolutely no mention of Maurice Monk, the fact that he had not moved in hours, that at different times in the day deputies suspected he may not be breathing – yet there was mention of when food was served and cells were cleaned along with several inane observations of disruptive inmate behavior such as one inmate refusing to return his inhaler.

103.    At approximately 8:24 AM on November 13, Defendant Deputies Saffarian and Mowrer along with Defendant Nurse Donoho were providing medication to the detainees in Mr. Monk's housing unit. When they arrived at Mr. Monk's cell, Defendant Saffarian tapped his key on the cell window and twice asked Mr. Monk if he wanted his medication. When Mr. Monk did not respond, Defendant Saffarian said "he's asleep" and the three Defendants left Mr. Monk's cell. Defendant Nurse Donoho recorded this as Mr. Monk refusing his medication.

104.    At approximately 10:49 AM on November 13, Defendant Mowrer and Pod Worker 1 arrived at Mr. Monk's cell while serving lunch in the housing unit. Defendant Mowrer tapped his key on Mr. Monk's window while calling his name. Defendant Mowrer claimed that he saw Mr. Monk moving but this was not captured on his body-worn camera. Pod Worker 1 then dropped the lunch on the floor of Mr. Monk's cell.

---

[1] *The Housing Unit Redbook is a calendarized book authored by the housing unit technician to document staffing, movement, and anything of importance during their shift.*

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

105.     During dinner service on November 13, 2021, at approximately 3:52 PM, Defendant Rowe and Pod Worker 1 arrived at Mr. Monk's cell. Pod Worker 1 looked at Mr. Monk through the cell window and told Defendant Rowe "he's not even moving." Defendant Rowe responded "yeah he is." Pod Worker 1 asked Defendant Rowe if he was sure and noted that this was the same pose he saw Mr. Monk in previously. Defendant Rowe's body-worn camera showed that in the same position he had been for the last **two days:** Mr. Monk was lying facing down on his mattress in his red Santa Rita Jail shirt with no pants on.



106.     There was a pool of brown liquid on the cell floor just below Mr. Monk. Food trays and medication cups were strewn across the cell. Defendant Rowe told Pod Worker 1 that Mr. Monk moved his arm. After closing the cell door, Defendant Rowe told Pod Worker 1 to look through the window to see that Mr. Monk was moving his toe. Mr. Monk did not appear to be moving his toe in the recording captured on Defendant Rowe's body-worn camera and Pod Worker 1 never replied in any manner to confirm Mr. Monk was indeed moving his toe. Defendant Rowe

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

then told Pod Worker 1 that he had also been worried about Mr. Monk but was not any longer because it appeared that Mr. Monk had moved his arm. Pod Worker 1 then advised Defendant Rowe that Mr. Monk was not even getting up to use the bathroom. Defendant Rowe said in response, "I know, he's just peeing on himself. Come on, you know how it is. There are people just shitting themselves." They then walked away from Mr. Monk's cell.

107.    Defendants have failed to produce any evidence that Defendant Rowe ever reported his observations that Mr. Monk was urinating on himself or Pod Worker 1's concerns that Mr. Monk had not changed positions in several days to any jail medical staff or supervisors.

108.    Defendant Deputy Hayer and Defendant Joseph Lopez, a nurse for the Defendant Wellpath, did the medication rounds in Mr. Monk's housing unit on the night of November 13. When they arrived at Mr. Monk's cell, Defendant Hayer knocked on the cell window and called Mr. Monk's name. Mr. Monk did not respond. Defendant Hayer told Defendant Lopez to place the medication into a paper cup and give it to him. Defendant Hayer then tossed the cup holding the medication onto the floor of Mr. Monk's cell. Defendant Lopez recorded this as Mr. Monk receiving his medication.

109.    At approximately 8:12 PM on the night of November 13, Defendant Craig Tanaka, a deputy sheriff for the Defendant County, went to Mr. Monk's cell to ask if he wanted pod time. He shone his flashlight into Mr. Monk's cell, knocked on window, and repeatedly asked Mr. Monk if he wanted pod time. Mr. Monk did not respond. Defendant Hayer, who was on the first floor of the unit, asked Defendant Tanaka, "Is he lying face down half naked?" in regards to Mr. Monk. Defendant Tanaka said "yes". Defendant Hayer then told Defendant Tanaka to "count that as a refusal and move on" to another cell.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

27

110.    Once again, Defendants have failed to produce any documentation that either Defendant Hayer or Defendant Tanaka reported this information to any jail medical staff or supervisors.

**NOVEMBER 14, 2021—ONE DAY BEFORE MR. MONK'S BODY WAS FOUND**

111.    On the morning of November 14, Defendant Hayer and Pod Worker 1 arrived at Mr. Monk's cell to give him breakfast at approximately at 6:09 AM. As Defendant Hayer opened the cell door, he asked "what's going on here?" Pod Worker 1 responded by saying "that's Monk". Defendant Hayer told Pod Worker 1 to put Mr. Monk's breakfast on the cell floor. Defendant Hayer's body-worn camera from the encounter shows Mr. Monk lying facing down on his mattress in his red Santa Rita Jail shirt with no pants on. There was a pool of brown liquid on the cell floor just below Mr. Monk.



112.    Mr. Monk did not move or say anything in the video. Pod Worker 1 told Defendant Hayer that Mr. Monk had "been like that for two days or so." Defendant Hayer did not seem to share Pod Worker 1's concern and moved on to the next cell without comment.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

113.    Later in the morning of November 14, at approximately 8:39 AM, Defendant Deputies Ross Burruel and Troy White and Defendant Nurse Donoho were providing medications to the detainees in Mr. Monk's housing unit. When they arrived at Mr. Monk's cell, Defendant Burruel asked Mr. Monk if he wanted his medication. Defendant White then told his colleague "he said he's fine." Mr. Monk cannot be heard or seen on either of the Defendant Deputies' body-worn camera recordings. The Defendants then moved on from Mr. Monk's cell. Defendant Donoho recorded this as Mr. Monk refusing his medication.

114.    At approximately 12:18 PM on November 14, Defendant Deputies Burruel and White along with Pod Worker 1 were serving lunch in Mr. Monk's housing unit. When they arrived at Mr. Monk's cell, Defendant Burruel asked "is that Monk?" Pod Worker 1 confirmed and said "he hasn't been getting up". Defendant Burruel opened the cuffing port of Mr. Monk's cell so that Pod Worker 1 could drop the lunch onto the cell floor. When the cuffing port was open, Defendant Burruel's body-worn camera captured numerous food trays, brown bag lunches, and the paper cups in which medication had been placed on the cell floor.

115.    At approximately 3:25 PM on November 14, Defendant Deputies White, Osmani, and Burrell performed a "wellness" check on Mr. Monk. When Defendant Osmani opened the door to Mr. Monk's cell, the entrance was littered with unopened food trays, brown paper bag lunches, and the paper cups containing medication that deputies had been dropping into his cell. Mr. Monk was lying face down on the mattress, wearing his Santa Rita Jail red t-shirt and naked from the waist down. The large pool of brown liquid on the cell floor beneath Mr. Monk appeared to have grown.

116.    During this safety check, Mr. Monk did not respond to the Defendant Deputies repeatedly calling his name. Defendants White and Osmani claimed that they saw Mr. Monk moving his foot and breathing, but determined that they needed to enter the cell to ensure that Mr.

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

29

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

1  Monk was okay. Defendants White and Osmani then entered Mr. Monk cell for approximately 15

2  seconds and shone a flashlight on his face before determining that he was fine because his eyes

3  were open and they claimed that he was breathing.



117.    The Defendant Deputies never touched him or felt for a pulse. Mr. Monk never

responded verbally to the Defendant Deputies. The deputies body worn cameras did not capture any

signs of life emanating from Mr. Monk. Notably, Mr. Monk's eyes were also open when his dead

body was found the next day.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

118.     At approximately 4:01 PM on November 14, Defendant Burruel and Pod Worker 1 arrived at Mr. Monk's cell to drop off dinner. Defendant Burruel opened the cell door and Pod Worker 1 placed the food on the floor near the front door. Mr. Monk was lying face down on the mattress, wearing his red Santa Rita Jail t-shirt and naked from the waist down. There was a large pool of brown liquid on the cell floor beneath Mr. Monk. He did not move or speak.

119.     At approximately 6:16 PM on November 14, Defendant Deputies Hamilton, Mefford, and J. Morales along with another deputy were doing the evening medication rounds with Defendant Nurse Kathleen Martinez. When they arrived at Mr. Monk's cell, Defendant Morales knocked on the cell window and shined his flashlight on Mr. Morales. He asked Mr. Monk if he wanted medication to which Mr. Monk did not respond. Defendant Morales then walked away from the cell window. Defendant Hamilton then walked up to the cell window and looked in while kicking on the door and asking Mr. Monk if he wanted his medication. When Mr. Monk did not respond, Defendant Hamilton told Defendant Nurse Martinez "let's go with a no". Defendant Martinez may have asked Defendant Hamilton if he wanted to wake up Mr. Monk. Defendant Martinez recorded this as Mr. Monk refusing his medication.

120.     By the end of November 14, 2021 - still not a single named Defendant reported Mr. Monk's condition and lack of responsiveness to any jail supervisors or medical staff supervisors – or requested a medical evaluation.

**NOVEMBER 15, 2021—THE DAY MR. MONK'S BODY WAS FOUND**

121.     On the morning of November 15, Defendant Deputy Matuesz Laszuk and Defendant Nurse Ranjeet Kaur were performing the morning medication rounds. When they arrived at Mr. Monk's cell at approximately 5:04 AM, Defendant Laszuk knocked on the cell door and window with his flashlight and asked Mr. Monk multiple times if he wanted medication. Mr. Monk did not respond. Defendant Laszuk continued knocking and shined his flashlight into the cell. Mr. Monk

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

still did not respond. Defendant Laszuk then told Defendant Kaur that Monk was sleeping and was

breathing. Defendant Kaur looked into the cell and agreed that Mr. Monk was breathing. Defendant

Laszuk's body-worn camera recording of this interaction did not capture Mr. Monk breathing,

speaking or making any audible sounds.

122.    Approximately 18 minutes later, Defendant Osmani and Pod Worker 1 arrived at Mr.

Monk's cell to give him breakfast. Defendant Osmani opened the cell door and Pod Worker 1

placed the food on the cell floor. Mr. Monk was lying face down on the mattress, wearing the Santa

Rita Jail red t-shirt and naked from the waist down. His left leg had slid off the mattress while his

right leg remained on the mattress. Mr. Monk did not move or say anything at any point. After

Defendant Osmani closed the cell door, Pod Worker 1 told him that Mr. Monk had been in that

position for the last couple days. Defendant Osmani responded "yeah I checked on him yesterday."



123.    At approximately 7:04 AM on November 15, Defendant Osmani was performing

wellness checks on the detainees in Mr. Monk's housing unit. When he arrived at Mr. Monk's cell,

he shined his flashlight through the window. Defendant Osmani repeatedly knocked on the door and

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

asked Mr. Monk if he wanted to go to court. Mr. Monk did not respond. Defendant Osmani then left Mr. Monk's cell.

124.     At approximately 12:09 PM on November 15, Defendant Deputy Rowe and Defendant Christopher Haendel, a sergeant for the Alameda County Sheriff's Office, along with Pod Worker 1 were distributing lunches to detainees.  When they arrived at Mr. Monk's cell, Defendant Haendel began looking through the cell window. He asked what Mr. Monk was doing and continued looking into the cell.

125.     Defendant Haendel then opened the cell door. Mr. Monk was lying face down on the mattress, wearing his red Santa Rita Jail t-shirt and naked from the waist down. His legs had begun sliding off the mattress and his left knee was on the ground. The large pool of brown liquid on the cell floor that began below Mr. Monk had reached the middle of the cell. Defendant Haendel repeatedly yelled at Mr. Monk several times to attempt to gain a response. Mr. Monk never moved or responded. Defendant Rowe told Defendant Haendel that Mr. Monk was "like this all the time." Defendant Haendel then closed the cell door and left Mr. Monk's cell. Strikingly, Defendant Haendel is a supervisor and failed to summon emergency services or any medical evaluation of Mr. Monk at all.

126.     Pod Worker 1 then asked Defendant Rowe regarding Mr. Monk, "Are we just waiting for him to kick the bucket?"

127.     Later that day, Defendant Deputy Rowe and Pod Worker 1 were distributing dinner to detainees. They arrived at Mr. Monk's cell at approximately 4:05 PM. When Defendant Rowe looked at Mr. Monk through the cell window, he immediately exclaimed "God!", though it is unclear exactly what prompted this response. After staring into Mr. Monk's cell for approximately 10-15 seconds, Defendant Rowe told Pod Worker 1, "his breathing is actually really rapid right now." Pod Worker 1 asked, "for real?" in response, to which Defendant Rowe responded "yeah he's

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

breathing up and down really quick". Defendant Rowe then opened the cell door and Pod Worker 1 placed the lunch on the cell floor. Like the past 3 days, Mr. Monk was still lying face down on the mattress while wearing his red Santa Rita Jail shirt and naked from the waist down. Both of his legs had slid off the bed at this point.



128.    The large pool of the brown liquid on the cell floor starting underneath Mr. Monk appears to have grown. Mr. Monk did not move or otherwise respond in the portion of Defendant Rowe's body-worn camera recording that captured Mr. Monk. Defendant Rowe asked Pod Worker 1, "are those all his trays?" in reference to the numerous unopened food trays at the front of Mr. Monk's cell. Pod Worker 1 confirmed that they were and said that he would have to clean "all that" at some point.

129.    As Defendant Rowe and Pod Worker 1 continued serving dinner on November 15, they discussed Mr. Monk further. Defendant Rowe asked Pod Worker 1, "How long has that been? He hasn't eaten in like two days?" Pod Worker 1 responded, "No, that's the second day of your shift, so it's got to be like three or four days." After a few seconds of silence as they continued

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

34

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

distributing dinners, Pod Worker 1 repeated "that's like the second day of your shift so that's like three or four days now." Defendant Rowe asked, "is that the second day in row he shit himself?" Pod Worker 1 responded, "Shit himself? Shit, that's been awhile." Defendant Rowe asked Pod Worker 1 if Mr. Monk always acted like that. Pod Worker 1 said "no, that's a first." Defendant Rowe then said that Mr. Monk "is normally yelling and loud, talking to himself." Pod Worker 1 agreed. A few seconds later, Defendant Rowe said "Yeah because when I got here two weeks ago, Monk was yelling all the time, he was going to court." Pod Worker 1 said "oh yeah, he started tripping the day after he came back from court." Defendant Rowe then said "Now he's different. He's been like that for at least three or four days."

130.     After Defendants Rowe and Gaston's safety check on Mr. Monk on November 12, Defendants never reported these observations regarding Mr. Monk's change in behavior and condition nor this conversation with Pod Worker 1 to any jail medical staff or supervisors. Defendants themselves never requested any further medical evaluation or intervention at all.

**MR. MONK'S BODY IS DISCOVERED AFTER 7 PM ON NOVEMBER 15**

131.     At approximately 7:26 PM on November 15, Defendant Mefford and Deputy Sheriff Hugo Torres were transporting a detainee back to his cell. As they passed Mr. Monk's cell, Deputy Torres looked through the cell window. Deputy Torres finished transporting the detainee to his cell and then returned to Mr. Monk's cell. He stood outside the cell for approximately 30 seconds, knocking on the door and yelling in an attempt to get Mr. Monk's attention. He then left to get a nurse and instructed Defendant Mefford to look for any "breathing movements." Defendant Mefford remained outside the cell for several minutes, shining his flashlight into the cell, knocking on the door and window, and yelling in hopes of getting a response from Mr. Monk. Deputy Torres then returned with Defendant Nurse Callabaio, Defendant Deputy Morales, and another deputy. Defendant Mefford told him that "If there's any breathing, it's really shallow." Deputy Torres

looked through the window and unsuccessfully tried again to get Mr. Monk's attention. Deputy Torres then notified Defendant Hamilton, who was standing downstairs, that they had an unresponsive detainee.

132.    Defendant Hamilton asked: "Is he just laying on his bunk? He does some weird things like that." Defendant Hamilton then walked upstairs to Mr. Monk's cell. Deputy Torres handed Defendant Hamilton his flashlight and told him that Mr. Monk had been in the same position for the last 20 minutes or so.

133.    Defendant Hamilton used the flashlight to look into the cell. As Defendant Hamilton was observing Mr. Monk, he asked "He's breathing, right?" and said that he could see Mr. Monk's chest moving. One minute after arriving at Mr. Monk's cell, Defendant Hamilton directed Defendant Nurse Callabaio and some of the other deputies to leave to continue pill call in another cell block, claiming that he did not want Defendant Nurse Callabiao to be there when they opened the door. Defendant Hamilton did not request that they keep medical staff on stand-by. Deputy Torres and Defendant Mefford remained with Defendant Hamilton.

134.    Defendant Hamilton opened the cell door. He shined the flashlight on Mr. Monk, who was laying face down on the mattress. He was wearing a red Santa Rita Jail t-shirt and was naked from the waist down. His legs had slid off the bed and were on the floor. The large pool of brown liquid on the cell floor that originated from below Mr. Monk was clearly visible. Deputy Torres yelled Mr. Monk's name, to which he did not respond. Defendant Hamilton appeared to gesture at the food trays and brown bags on the floor in front of the cell door and asked, "When is the last time that this dude has eaten?" Deputy Torres responded that "this food is untouched."

/

/

/



135.     Defendant Hamilton grabbed one of the meals from the floor and repeatedly asked

Mr. Monk if he was hungry. Deputy Torres also continued yelling "Monk!" intermittently.

Defendant Hamilton then told Deputy Torres they needed to check Mr. Monk out. He asked Deputy

Torres "You see how red it is there?" and gestured at Mr. Monk's mattress. Alameda County field

evidence technician Jason Podany would later note that there was a red imprint on the mattress that

appeared to be a "color transfer" from the shirt that Mr. Monk was wearing. Defendant Hamilton

then closed Mr. Monk's cell door and instructed Deputy Torres to get two additional deputies to

assist them. Defendant Deputies Hamilton and Mefford then waited outside Mr. Monk's cell. They

did not call for medical assistance while they waited.

136.     Defendant Deputy Laszuk arrived at Mr. Monk's cell approximately one minute after Defendant Hamilton closed the cell door. Defendant Hamilton told him that Mr. Monk "wasn't very responsive", it looked like he had been urinating on himself, and he had "a whole bunch of food" in his cell so it looked like he had not eaten for several meals. Defendant Laszuk said this was "exactly" what he had seen Mr. Monk do when Defendant Laszuk saw him "at John George about a month ago". He further explained that when he had previously seen Mr. Monk at John George Psychiatric Hospital, Mr. Monk was catatonic, did not want to eat, and was being spoon fed by staff.

137.     Deputy Torres and Defendant Deputies Hamilton and Nurse Laszuk then entered Mr. Monk's cell. Deputy Torres continued calling Mr. Monk's name and shined his flashlight on him. He noted that Mr. Monk's eyes were open. Deputy Torres then began touching Mr. Monk's upper back and pulling at his shirt. Deputy Torres told Defendant Hamilton that Mr. Monk was unresponsive and was "stiff". Defendant Hamilton then put out a Code 3 call over the radio. Deputy Torres put his hand to Mr. Monk's neck for a few seconds before saying "no pulse." In response, Defendant Hamilton said "oh Jesus", turned around, and walked out of the cell. He told the deputies outside the door to put out a Code 3 call and to go get a nurse. Deputy Torres and Defendant Laszuk stood inside the cell over Mr. Monk's body. They did not attempt any life-saving measures until Defendant Hamilton told them to pull Mr. Monk out of his cell and start CPR. Defendant Hamilton then left Mr. Monk's cell to go secure other detainees who were outside of their cells on pod time.

138.     Defendant Laszuk then dragged Mr. Monk out of his cell by his shirt. Other deputies began performing chest compressions on Mr. Monk. A nurse arrived soon after and helped with the chest compressions. Tragically, these efforts were unsuccessful. Mr. Monk was pronounced dead later that night, 35 days after he was first brought to Santa Rita Jail.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

139.    When Mr. Monk's autopsy was performed, he appeared to have large bed sores on the front of legs, further evidencing that Mr. Monk did not move for a long period of time before his dead body was removed the cell.



## BODY WORN CAMERA EVIDENCE

Plaintiff has attached to his Complaint body worn camera that captured the important interaction between Defendant jail and medical staff. A summary of those interactions has been attached to his Complaint as **Exhibit 1.** The portions of the body camera video evidence themselves have been attached and lodged to the Court as **Exhibit 2:**

1.  COUNTY 10 @ 3:02 - 3:24
2.  COUNTY 12 @ 8:48 - 9:14
3.  COUNTY 15 @ 7:51 - 8:03
4.  COUNTY 3314 @ 1:50-11:40
5.  COUNTY 3320 @ 4:30-6:30
6.  COUNTY 3328 @ 5:40-6:10
7.  COUNTY 3356 @ 3:30-8:30
8.  COUNTY 3364 @ 6:10-6:24
9.  COUNTY 3369 @ 5:02 - 5:48
10. COUNTY 3373 @ 5:18 - 5:50
11. COUNTY 3375 @ 00:31-02:28
12. COUNTY 3376 @ 4:50 - 5:50
13. COUNTY 3382 @ 3:02 - 3:24

**INTERNAL AFFAIRS INVESTIGATION**

140.     Following Mr. Monk's death, the Alameda County Sheriff's Office launched an internal affairs investigation into the actions of several of the Defendant Deputies on November 14 and 15, 2021, regarding Mr. Monk. This investigation was headed by Alameda County Sheriff's Office Sergeant Joseph Atienza.

141.     As part of the internal affairs investigation, Sergeant Atienza investigated Defendant Deputy Rowe. Segreant Atienza found that Defendant Rowe "neglected his duty to provide care for" Mr. Monk and that Defendant Rowe "failed to conduct adequate safety checks and act on apparent signs of medical distress." Sergeant Atienza identified ten of the Defendant County's policies that Defendant Rowe violated. Upon a review of Defendant Rowe's body-worn camera recordings, Sergeant Atienza observed several instances where Defendant Rowe should have identified that Mr. Monk needed medical care. Sergeant Atienza also noted that Pod Worker 1 made comments on multiple occasions about Mr. Monk's declining health.

142.     Santa Rita Jail's Detention and Corrections Policy and Procedure 8.12 requires that sworn staff shall personally observe all inmates in Housing Unit 1 at least once every 30 minutes on an irregular schedule.

143.     Santa Rita Jail's Detention and Corrections Policy and Procedure 8.12 states that the observation log ("GOL") will reflect the time each observation was completed along with the observing deputies` initials. Detention and Corrections Policy and Procedure 8.12 also states staff shall not make entries based on other staff members observations.

144.     The observation log (GOL) for November 14, 2021 from 5:00 AM to the following day at November 15, 2021 4:30 AM contained staff initials next to observation at **exact 30 minute increments** in direct violation of policy 8.12.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

145.     In the RedBook[2] (a log for all unusual activity in Housing Unit 1), there was absolutely no mention of Maurice Monk, the fact that he had not moved in hours, that at different times in the day deputies suspected he may not be breathing – yet there was mention of when food was served and cells were cleaned along with several inane observations of disruptive inmate behavior such as one inmate refusing to return his inhaler.

146.     ACSD Body-Worn Camera Policy mandates that deputies activate their body worn cameras during **all observation checks, including general observations, Intensive Observation Logs (IOL), and other regular checks**

147.     On just November 14, 2021, Dep. Osmani, Dep. White & Buruell signed for the following **twelve (12)** observations:

-0630 hours, observation initialed by "SO" (Deputy S. Osmani)
-0700 hours, observation initialed by "SO" (Deputy S. Osmani)
-0900 hours, observation initialed by "TW" (Deputy T. White)
-1000 hours, observation initialed by "TW" (Deputy T. White)
-1030 hours, observation initialed by "TW" (Deputy T. White)
-1100 hours, observation initialed by "TW" (Deputy T. White)
-1130 hours, observation initialed by "TW" (Deputy T. White)
-1400 hours, observation initialed by "TW" (Deputy T. White)
-1430 hours, observation initialed by "RB" (Deputy R. Burruel)
-1530 hours, observation initialed by "RB" (Deputy R. Burruel)
-1630 hours, observation initialed by "TW" (Deputy T. White)
-1700 hours, observation initialed by "TW" (Deputy T. White)

148.     Sergeant Atienza found the deputies failed to activate their body-worn camera for each and every one of these observations. For example, Sgt. Atienza investigated Defendant Deputy Osmani. He found that, on both November 14 and 15 of 2021, Defendant Osmani failed to conduct observation checks and activate his body-worn camera in accordance with Defendant County's policy. During the course of the investigation, Defendant Osmani

---

[2] *The Housing Unit Redbook is a calendarized book authored by the housing unit technician to document staffing, movement, and anything of importance during their shift.*

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

admitted to signing the observation log on behalf of other deputies and that the times

authored for general observation checks were inaccurate.

149.     Defendant White was another one of the deputies investigated by Sergeant Atienza.

Sergeant Atienza found that Defendant White violated numerous Defendant County's

policies on November 14 and 15 of 2021 by failing to activate his body-worn camera during

general observation checks and by failing to conduct general observation checks. During the

course of this investigation, Sergeant Atienza also found that Defendant White signed

observation logs multiple times when he had not been physically present for the

ovbservations and recorded inaccurate times for these observations. On November 15, 2021,

Defendant White signed the observation log for a time in which he was not even in Mr.

Monk's housing unit, let alone at his cell.

150.     Sergeant Atienza also investigated the conduct of Defendant Deputy Burruel. He

found that Defendant Burruel violated numerous of Defendant County's policies by failing

to properly conduct general observation checks on Mr. Monk on November 14, 2019.

During his interview with Sergeant Atienza, Defendant Burruel admitted that the recorded

times of the general observation checks were inaccurate. Sergeant Atienza also found that

Defendant Burruel violated Alameda County General Order 8.17 by failing to activate his

body-worn camera during two observation checks on November 14, 2021.

## MONELL ALLEGATIONS

151.     Plaintiffs are informed, believe, and therein allege that Defendant Alameda County

exhibits a pattern and practice of exposing pre-trial detainees to unconstitutional detention

conditions and procedures at Santa Rita Jail and despite these incidents, none of the Sheriff's

Deputies and/or other jail staff are ever found in violation of department policy or

disciplined, even under the most questionable of circumstances. Defendant Alameda

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

42

County's failure to discipline or retrain Santa Rita Jail staff is evidence of an official policy, entrenched culture and posture of deliberate indifference toward protecting citizen's rights and the resulting death and injuries is a proximate result of the Defendant Alameda County's failure to properly supervise its Deputies and/or other jail staff and ratify their unconstitutional conduct. Plaintiff is informed, believe, and therein allege that the following instances are examples of the Alameda County's pattern and practice of condoning misconduct by failure to discipline and/or train:

a. On April 3, 2021, detainee Vinetta Martin hung herself with a bedsheet in her cell. Ms. Martin was designated a "special management inmate" after informing staff three weeks earlier that she intended to kill herself. Though Ms. Martin's inmate designation required deputies to conduct direct visual observation checks every 30 minutes, video evidence showed that Alameda County Sheriff's Deputies repeatedly failed to follow procedure and perform these observation checks, leaving Ms. Martin unattended for extended periods of times. To cover up this malfeasance, deputies falsified observation logs to create the appearance that they had followed policy. On May 26, 2023, the Alameda County District Attorney's Office announced that it is filing felony criminal charges against Alameda County Sheriff's Deputies Sheri Baughman and Amanda Bracamontes for doctoring the observation logs regarding Ms. Martin.[3]

b. As of February 14, 2023, at least 65 detainees had died at Santa Rita Jail since 2014.[4] On April 27, 2023, a detainee was found dead in his cell after being taken to the jail

---

[3] https://www.alcoda.org/alameda-county-district-attorney-public-accountability-unit-levels-criminal-charges-at-three-law-enforcement-officers/
[4] https://www.ktvu.com/news/woman-dies-at-santa-rita-jail-3rd-person-in-a-month

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

43

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

medical unit for observation earlier that day.[5] At least five detainees died at Santa

Rita Jail in the first four months of 2023 alone.[6]

c.   In 2021, detainee Juan Jesus Chaidez was required to wear a colostomy bag on his

abdomen, and medical staff was aware that Mr. Chaidez was prone to likely

infection.  A discharge from Chaidez's stomach was noted but left untreated as

medical staff determined that Chaidez had a normal discharge with no infection.

Due to medical neglect, Chaidez suffered a colitis infection inside his colon and

pelvis.  *Chaidez v. Santa Rita Jail, et al.*, (N.D. 2021) Case 3:21-cv-04240-RS.

d.   In 2021, detainee Terry Gordon was given medication for a neck/spine operation.

Gordon informed the nurse and guard that he believed he received the incorrect

medication because it tasted strange. The Santa Rita Jail nurse then used a guard's

flashlight to crush up the appropriate pill to cover up the fact that Gordon was given

the wrong one.  Due to taking the incorrect medication, Gordon suffered various side

effects including throwing up, dizziness, and cold sweats.  *Gordon v. Santa Rita*

*Medical Staff*, Case 3:21-cv-03885-CRB

e.   In 2017, detainee Peter Cole suffered from three badly abscessed teeth.  Cole

submitted three different medical requests for treatment from the Jail, but all were

ignored. Cole was repeatedly told that he needed to wait and was only given pain

medication for three days while he spent the rest of the time waiting in severe pain.

Cole's face was badly swollen and infected for at least a month and a half until

medical care was finally rendered.  Due to the neglect, Cole suffered permanent

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

---

[5] https://www.cbsnews.com/sanfrancisco/news/inmate-death-santa-rita-jail/
[6] https://www.pleasantonweekly.com/news/2023/04/28/man-arrested-in-livermore-dies-in-jail-becomes-5th-inmate-death-for-santa-rita-in-2023

1   disfiguration in his face, jaw, and gums.  *Cole v. Santa Rita Jail*, (N.D. 2018) Case

2   4:18-cv-02874-HSG.

3   f.   In 2014, Lawrence Bennetto suffered from severe bone disease and was prescribed

4   morphine administered under a doctor's supervision.  Once detained in Santa Rita

5   Jail, Bennetto was denied his morphine by jail and medical staff.  Bennetto's heath

6   dramatically deteriorated and at one point was in convulsions for 43 hours. Bennetto

7   lost 25 lbs., and almost all of the hair on his body. Despite his severe reactions, Santa

8   Rita Jail staff did not give Bennetto his proper medication for 22 days, at which point

9   Bennetto began to regain his health.  *Lawrence Bennetto v. Santa Rita Jail*, (N.D.

10   2016) Case 3:16-cv-05464-SK.

11   g.   In 2015, detainee Rickey Moore received improper medical treatment when he was

12   given the wrong medications and doses for his diabetes and hypertension. Moore

13   nearly died and suffered from swelling of his lower extremities while incarcerated

14   and after his release.  *Moore v. Corizon Health Services, et al.*, (N.D. 2016) Case

15   4:16-cv-04195-DMR.

16   h.   In 2014, detainee James Duckett suffered from a long history of glaucoma, pain in

17   both his eyes, and vision problems. While in Santa Rita, Duckett requested to be seen

18   by an optometrist, but was merely put on a list for an extended period of time. When

19   Duckett was finally seen, he was diagnosed with glaucoma but was denied his

20   necessary eyedrops that he was prescribed outside of jail.  *Duckett v. Corizon PHS,*

21   *et al.*, (N.D. 2016) Case 4:16-cv-02293-KAW.

22   i.   In 2014, detainee Michael Davis told Santa Rita Jail medical staff during intake that

23   he had arthritis in both knees and had trouble walking. Medical staff ordered Davis a

24   walking cane and prescribed him a lower bunk bed, but Davis was given neither by

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

1  jail staff, who made Davis continue to use his standard bunk bed, which resulted in

2  Davis falling from his bed, injuring his knees and back. *Davis v. Santa Rita Jail, et*

3  *al.*, (N.D. 2014) Case 3:14-cv-01468-EMC.

4     j.   In 2013, Santa Rita medical staff denied detainee Michael Henderson an inhaler for

5  his asthma, metoprolol for his heart condition, and sertraline for his mental

6  condition.  Henderson was required to get a court order to even be seen by doctors at

7  the jail. Once seen, medical staff only ordered an x-ray of Henderson and only gave

8  him ointment for his taser wounds. Henderson was never given his medications.

9  *Henderson v. Reina, et al.*, (N.D. 2013) Case 4:13-cv-00765-SBA.

10

11  152.    Plaintiffs are informed, believe, and therein allege that Defendant Alameda County

12  knew, had reason to know by way of actual or constructive notice of the aforementioned

13  policy, culture, pattern and/or practice and the complained of conduct and resultant

14  injuries/violations.

15

16  153.    Defendant County Alameda has a policy within Santa Rita Jail to place pre-

17  arraignment, pretrial detainees suffering mental health disorders in solitary confinement

18  cells for extended periods of time that are never washed, are caked with feces, drenched in

19  urine, contain no sink, no toilet, and contain only a hole for inmates to defecate and urinate.

20  154.    Defendant County Alameda also has a policy to deny pre-arraignment, pretrial

21  detainees suffering mental health disorders access to psychiatric treatment and medicine

22  despite being notified their conditions requires this necessary medical treatment to prevent

23  the inmates risks of suicide and to prevent their mental health condition from worsening and

24  causing new and irrecoverable damage to their psyches. Defendant County does not even

25  provide minimal access to psychiatric treatment by failing to using trained professionals to

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

substantively evaluate pre-trial detainees for mental health disorders and/or securing them medications.

155.     Isolation cells are used as punishment for non-mentally ill inmates as part of the Santa Rita jail's disciplinary policy. The isolation cells serve a secondary purpose to segregate and hold mentally ill persons simply because they are mentally ill. Therefore, deputies placed Sweiha in these abject conditions no other prisoners that did not suffer mental health issues would be placed without having done something to deserve such a punishment and prior to any arraignment for the alleged criminal wrongdoings.

156.     Defendant County Alameda has a policy of using isolation cells as form of punishment for mentally ill inmates and other inmates. Disciplinary Isolation is defined in Defendants' policies as "punitive segregation from the general jail population and restricted privileges for an inmate who has committed a serious rule violation." Such "serious rule violations" include being generally disrespectful, excessive whistling or other noise, possessing unauthorized clothing, reporting to a program late, failing to cooperate with work or education programs, possessing more than 15 vending machine tokens, or failing to return a tray after meal time. Individuals in Disciplinary Isolation are permitted to leave their cells for up to one hour a day, five days a week. There is no cap on the use of Disciplinary Isolation and prisoners may be held in Disciplinary Isolation for more than 30 days, even for a single rule violation, where authorized by the Commanding Officer at the Jails.

157.     Alameda County's use of these isolation cells has had tragic consequences and, over the last five years, at least thirty-three individuals incarcerated in the Alameda County Jails have died, including thirteen individuals who committed suicide with many more unsuccessful attempts. These deaths are not isolated tragedies but rather are indicative of the harsh and unconstitutional conditions in the Santa Rita Jail.

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

47

158.     By Jail policy, prisoners can be confined for up to 72 hours in these cells. Yet it is customary for prisoners to be forced to stay in such cells for a week or more at a time. Conditions so bad, prisoners have stopped reporting suicidal feelings to staff in order to avoid being thrown into safety cells.

159.     For example, in 2016, Alameda County Sheriff's Deputies Sarah Krause and Stephen Sarcos have also been charged and arrested for weaponizing feces and urine to punish a mentally ill inmate.

160.     In 2018, eight inmates filed a suit against Alameda County for unconstitutional use of isolation cells on mentally-ill persons, the isolation cells being caked in feces and urine with no furniture or toilet, and denial of even minimal access to psychiatric treatment and medication.

### DAMAGES

161.     As a direct and proximate result of each of the Defendant's deliberate indifference to Decedent's obvious medical needs and distress, Decedent and Plaintiffs suffered injuries, emotional distress, fear, terror, anxiety, and loss of sense of security, dignity, and pride as United States Citizens.

162.     As a direct and proximate result of each Defendants' act and/or omissions as set forth above, Plaintiffs sustained the following injuries and damages, past and future, among others:

k.   Wrongful death of MAURICE MONK;

l.   Hospital and medical expenses;

m.   Coroner's fees, funeral and burial expenses;

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

48

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

n.   Loss of familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support and loss of familial association;

o.   Pain and Suffering, including emotional distress (by Plaintiffs, based on her individual §1983 claim for loss of familial association);

p.   MAURICE MONK's conscious pain and suffering, pursuant to federal civil rights law (Survival claims);

q.   MAURICE MONK's loss of life, pursuant to federal civil rights law;

r.   Violation of constitutional rights; and

s.   All damages, penalties, and attorneys' fees and costs recoverable under 42 U.S.C. §§ 1983, 1988; California Civil Code §§ 52, 52.1, California Code of Civil Procedure § 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

163.    The conduct of Defendant Jail & Medical Staff was malicious, wanton, oppressive, and in reckless disregard of the rights and safety of MAURICE MONK, Plaintiff, and the public. Plaintiffs are therefore entitled to an award of punitive damages against the individual Defendant DOES 1-50.

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**
**(Fourteenth Amendment – Deliberate Indifference under 42 U.S.C. Section 1983)**
*(Plaintiff ESTATE OF MONK as successor-in-interest to Decedent against ALL INDIVIDUAL DEFENDANTS and DOES 1-25)*

164.    Plaintiffs hereby re-allege and incorporate by reference each and every paragraph of this Complaint.

165.     By the actions and omissions described above, individual Defendants & DOES 1-50 violated 42 U.S.C. §1983, depriving Decedent of the following clearly established and well-settled constitutional rights protected by the Fourteenth Amendment to the United States Constitution:

    t.   The right to be free from deliberate indifference to Decedent's serious medical needs while in custody as secured by the Fourteenth Amendment.

166.     Defendants and DOES 1-50 subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein with reckless disregard for whether the rights and safety of Decedent would be violated by their acts and/or omissions.

167.     As a result of their misconduct, Defendants DOES 1-50 are liable for Decedent's injuries and/or damages.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**
**(Fourteenth Amendment – Familial Loss under 42 U.S.C. Section 1983)**
*(Plaintiffs individually against ALL INDIVIDUAL DEFENDANTS and DOES 1-25)*

168.     Plaintiff hereby re-alleges and incorporates by reference each and every paragraph of this Complaint.

169.     By the actions and omissions described, Defendants DOES 1-50 violated 42 U.S.C. § 1983, depriving Plaintiff of the following clearly established and well-settled constitutional rights protected by the Fourteenth Amendment of the United States Constitution including:

    u.   Right to familial association.

170.     All individually-named Defendants and DOES 1-25 subjected Decedent to their wrongful conduct, thereby depriving Decedent and Plaintiff of the rights described herein with reckless disregard for whether the rights and safety of Plaintiff and others would be violated by their acts and/or omissions. Defendant DOES 1-50 were deliberately indifferent

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

50

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

to Decedent's serious medical needs, thereby depriving Plaintiff of her familial relationship with her father.

171.     As a direct and proximate result of Defendant DOES 1-50's acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth herein.

172.     Defendant DOES 1-50's conduct entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
### (Supervisory and Municipal Liability for Unconstitutional Custom or Police Practice – 42 U.S.C. section 1983 (Monell))
### (Plaintiffs against Defendants COUNTY, WELLPATH and DOES 26-50)

173.     Plaintiffs hereby re-allege and incorporate by reference each and every paragraph of this Complaint.

174.     Plaintiffs are informed and believe and therein allege that the COUNTY OF ALAMEDA and WELLPATH high-ranking officials, including DOES 26-50,  knew and/or reasonably should have known that Santa Rita Jail staff, including Alameda County Sheriff's Deputies and jail medical staff, exhibits a pattern and practice of improper and inadequate medical treatment for detainees, including depriving them of necessary medical treatment and medications, and despite these incidents, none of the Santa Rita Jail medical staff or employees of the Santa Rita Jail are found to be in violation of jail policy or disciplined or retrained, even under the most questionable of circumstances.  COUNTY OF ALAMEDA & WELLPATH'S failure to discipline or retrain medical staff is evidence of an official policy, entrenched in a deliberate indifference for the safety, health, and wellbeing of detainees, and the resulting deaths and injuries are a proximate result of the COUNTY OF ALAMEDA & WELLPATH's failure to properly supervise its medical staff and ratify their unconstitutional conduct.  Plaintiffs are informed, believe, and therein allege that the

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

51

instances previously discussed in the *Monell Allegations* section) are examples of the COUNTY OF ALAMEDA & WELLPATH'S pattern and practice of condoning misconduct by failure to discipline, retrain, and supervise.

175.   Despite having such notice, Plaintiffs are informed and believe and thereon allege that Defendants, and DOES 26-50, and/or each of them, approved, ratified, condoned, encouraged and/or tacitly authorized the continuing pattern and practice of misconduct and/or civil rights violations by said Santa Rita medical staff and/or employees.

176.   Plaintiffs are further informed and believe and thereon allege that as a result of the deliberate indifference, recklessness, and/or conscious disregard of the misconduct by Defendants and DOES 26-50, and/or each of them, encouraged these medical staff and/or employees to continue their course of misconduct, resulting in the violation of Decedent's and Plaintiffs' rights as alleged herein.

177.   The unconstitutional actions and/or omissions of all named individual defendants, as well as other medical staff employed by or acting on behalf of Defendant COUNTY OF ALAMEDA & WELLPATH on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of the Santa Rita Jail stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officers for the COUNTY OF ALAMEDA & WELLPATH:

   v.   To cover-up violations of constitutional rights by any or all of the following:

      i.   by failing to properly investigate and/or evaluate complaints or incidents of improper or inadequate medical treatment;

      ii.   by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful activity; and

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

    iii.  by allowing, tolerating, and/or encouraging medical staff to make false statements, file false reports, and/or withhold or conceal material information.

w.  To allow, tolerate, and/or encourage a code of silence among Santa Rita medical staff and employees whereby medical staff and/or employees do not provide adverse information against fellow employees;

x.  To use or tolerate inadequate, deficient, and improper procedures for handling, investigating, and reviewing complaints of misconduct by medical staff and employees;

y.  To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint, with deliberate indifference to the rights and safety of Plaintiff and other detainees, and in the face of an obvious need for such policies, procedures, and training programs to prevent reoccurring and foreseeable violations of rights of the type described herein.

z.  To have in place trainings, policies and procedures that deprive inmates & detainees of prescribed medications despite knowledge of their necessity and the risks of injury/death involved with depriving and/or delaying the administration of medications

178.    Defendants COUNTY OF ALAMEDA & WELLPATH and DOES 26-50 failed to properly train, instruct, monitor, supervise, evaluate, investigate, and discipline DOES 1-25, and other Santa Rita Jail personnel, with deliberate indifference to Plaintiffs' and Decedent's constitutional rights, where were thereby violated as described above.

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

53

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

179.     The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately train, instruct, monitor, supervise, evaluate, investigate, and discipline, as well as the unconstitutional orders, approvals, ratification and toleration of wrongful conduct of Defendant COUNTY OF ALAMEDA & WELLPATH and DOES 26-50, were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's clearly-established and well-settled constitutional rights in violation of 42 U.S.C. §1983, as more fully set forth in Cause of Action 1-3, above.

180.     Defendants subjected Plaintiffs and Decedent to their wrongful conduct, depriving Plaintiffs and Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs and Decedent and others would be violated by their acts and/or omissions.

181.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices and procedures of Defendants COUNTY OF ALAMEDA & WELLPATH and Does 26-50 as described above, plaintiffs sustained serious and permanent injuries and are entitled to damages, penalties, costs and attorneys' fees as set forth in above.

182.     Plaintiff also seeks punitive damages against WELLPATH.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
**(Title II of American with Disabilities Act)**
*(Plaintiffs against Defendants COUNTY & WELLPATH)*

183.     Plaintiffs hereby re-allege and incorporate by reference each and every paragraph of this Complaint.

184.     As against Defendants COUNTY, WELLPATH and/or DOES 1-50, the Defendants failed to reasonably accommodate Plaintiff's schizophrenia under Title II of the Americans with Disabilities Act and from excluding qualified individuals from participating in or

denying benefits and services provided by Defendant COUNTY & WELLPATH; or from otherwise discriminating against such qualified individuals with symptoms of disability recognized under Title II of the Americans with Disabilities Act, resulting in refusal to adequately accommodate Decedent's disability during the course of the subject-incident. Defendants COUNTY, WELLPATH and DOES 1-50 were informed of Decedent's disability repeatedly by Decedent's family and were provided medical records to this effect. Defendants COUNTY, WELLPATH and DOES 1-50 knew or should have known that depriving Decedent of all of his prescribed medications and forcing a sudden cessation in the usage of said medications would foreseeably cause significantly more injury because of Decedent's disability than would be suffered by other members of the public. As a result of Defendants COUNTY, WELLPATH and DOES 1-50 refusing to reasonably accommodate Decedent's disability, Decedent died while in the custody of Defendant COUNTY & WELLPATH.

185.    As against Defendant COUNTY, WELLPATH and DOES 1-50, the Defendants knew and/or had reason to know of Decedent's disability and were provided the prescribed medication that Decedent needed by members of Decedent's family, yet nonetheless elected to continue depriving Decedent of his medication.

186.    The aforementioned conduct of Defendants COUNTY, WELLPATH and DOES 1-50, in failing to reasonably accommodate Plaintiff's disability, discriminated against Plaintiff by reason of his recognized disability.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**(Negligence & Wrongful Death)**
*(Plaintiffs individually and as successor-in-interest against ALL DEFENDANTS)*

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

55

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

187.    Plaintiffs hereby re-allege and incorporate by reference each and every paragraph of this Complaint.

188.    At all times, all defendants owed Plaintiffs and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

189.    At all times Defendants all defendants owed Plaintiffs and Decedent the duty to act with reasonable care.

190.    These general duties of reasonable care and due care owed to Plaintiffs and Decedent by Defendants include but are not limited to the following specific obligations:

   aa.  To provide medical attention to Decedent's serious medical needs;

   bb.  To refrain from abusing their authority granted them by law;

   cc.  To refrain from violating Plaintiff and Decedent's rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

191.    Defendants, through their acts and omissions, breached each and every one of the aforementioned duties owed to Decedent and Plaintiff.

192.    Defendant COUNTY and WELLPATH are vicariously liable for the wrongful acts and omissions of its employees and agents pursuant to Cal. Gov. Code section 815.2.

193.    As a direct and proximate result of Defendants' negligence, Plaintiff and Decedent sustained injuries and damages, Cal. Code of Civ. Proc. §§ 377.20 et seq., 377.60 et seq., 1021.5, and against each and every Defendant is entitled to relief as set forth above.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth

**SIXTH CAUSE OF ACTION**
**(Violation of the Bane Act (Cal. Civ. Code § 52.1))**
*(Plaintiff ESTATE against ALL DEFENDANTS)*

194.     Plaintiffs hereby re-allege and incorporate by reference each and every paragraph of this Complaint.

195.     Plaintiffs bring their "Bane Act" claim individually for direction violation of her own rights.

196.     By their conduct described herein, all Defendants, acting in concert/conspiracy, as described above, violated Plaintiff's rights under California Civil Code §52.1, and the following clearly-established rights under the United States Constitution and the California Constitution:

197.     Decedent's constitutional right to have his serious medical needs attended while in jial in violation of the Fourteenth Amendment.

198.     All of Defendants' violations of duties and rights were volitional, intentional acts, done with reckless disregard for Plaintiff's rights; none was accidental or merely negligent.

199.     Defendant COUNTY & WELLPATH are vicariously liable, pursuant to Cal. Gov. Code § 815.2, for the violation of rights by its employees and agents.

200.     As a direct and proximate result of Defendants' violations of California Civil Code §52.1 and of Plaintiff's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages, and against all Defendants and is entitled to relief as set forth above, including punitive damages against all individual defendants, and including all damages allowed by Cal. Civ. Code §§ 52, 52.1, and California law, not limited to costs, attorneys' fees, treble damages, and civil penalties.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth

**SEVENTH CAUSE OF ACTION**
**(Violation of Cal. Civ. Code § 845.6)**
*(Plaintiffs against ALL DEFENDANTS and DOES 1-50)*

201.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

202.     ALL INDIVIDUAL Defendants and REMAINING DOES knew or had reason to know that MAURICE MONK was in need of immediate medical care and treatment, and each failed to take reasonable action to summon immediate medical care and treatment.

203.     Each such individual defendant, employed by and acting within the course and scope of his/her employment with Defendants CITY and COUNTY, knowing and/or having reason to know of MAURICE MONK'S need for immediate medical care and treatment, failed to take reasonable action to summon such care and treatment in violation of California Government Code § 845.6.

204.     Defendant COUNTY & WELLPATH are vicariously liable, pursuant to Cal. Gov. Code § 815.2, for the violation of rights by its employees and agents

205.     As a direct and proximate result of the aforementioned acts of these Defendants, Plaintiff and Decedent were injured as set forth above, and their losses entitle Plaintiff to all damages allowable under California law. Plaintiffs (individually and as Successor in Interest for Decedent) sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees under California law as set forth above, including punitive damages against these individual Defendants

## JURY DEMAND

206.     Plaintiff hereby demands a jury trial in this action.

## PRAYER

WHEREFORE, Plaintiffs pray for relief as follows:

    1.     For general damages in a sum to be proven at trial;

    2.     For special damages, including but not limited to, past, present, and/or future wage loss, income and support, medical expenses and other special damages in a sum to be determined according to proof;

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

3.      For punitive damages against all individual defendants and Defendant WELLPATH in a sum according to proof;

4.      For reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and § 794 (a); Cal. Code of Civ. Proc. §§ 377.20 et seq., 377.60 et seq., 1021.5, Cal. Civil Code §§ 52 et seq., 52.1, and as otherwise may be allowed by California and/or federal law

5.      Any and all permissible statutory damages;.

6.      For injunctive relief, including but not limited to, changing the medical response procedures, policies and guidelines for attending to detainees and inmates psychiatric and health care medical needs; requiring in-person annual trainings on policies for jail & medical staff for procedures, policies and guidelines for attending to detainees and inmates psychiatric and health care medical needs; requiring medical nursing staff to provide their patients medications and not pass medications to unlicensed law enforcement officers.

7.      For the cost of suit herein incurred; and

8.      For such other and further relief as the Court deems just and proper.

Dated: October 10, 2023            POINTER & BUELNA, LLP
                                   LAWYERS FOR THE PEOPLE

                                   /s/ Patrick Buelna
                                   PATRICK BUELNA
                                   Attorney for PLAINTIFF

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Ste 208, Oakland, CA 94607

PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES
MONK v. ALAMEDA COUNTY, et al.

59